SUCHOVALSKY v. CITY OF NEW YORK.

(Supreme Court, Appellate Term.　January 5, 1911.)

MUNICIPAL CORPORATIONS (§ 788*)—STREETS—DEFECTS—NEGLIGENCE.
　　Where a city did not have actual knowledge of a defect in a street
　made by an excavation, and it had not existed long enough to impute
　knowledge thereof to it, the city was not liable for injuries caused by fall-
　ing into the excavation.
　　[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
　1641–1643; Dec. Dig. § 788.*]

　Appeal from Municipal Court, Borough of Manhattan, Fourth Dis-
trict.

　Action by Abraham Suchovalsky against the City of New York.
From a judgment for plaintiff, defendant appeals.　Reversed, and new
trial ordered.

　Argued before GIEGERICH, BRADY, and GAVEGAN, JJ.

　Archibald R. Watson, Corp. Counsel (Theodore Connoly and Loyal
Leale, of counsel), for appellant.
　Goldstein & Goldstein, for respondent.

　GIEGERICH, J.　This is an action to recover damages for per-
sonal injuries sustained by the plaintiff in falling into an excavation
in one of the streets of the city of New York.　As there was no evi-
dence that the defendant had actual knowledge of the excavation, or
that it had existed for such length of time as to justify the imputation
of knowledge, there was no sufficient support for the claim that the
city had been negligent in failing properly to guard the excavation.
McDonald v. Degnon-McLean Contracting Co., 124 App. Div. 824,
827, 828, 109 N. Y. Supp. 519; Buckley v. City of New York, 135
App. Div. 512, 514, 515, 120 N. Y. Supp. 423.

　The judgment, consequently, was not sustained by the evidence, and
should be reversed, and a new trial ordered, with costs to the appel-
lant to abide the event.

　Judgment reversed, and new trial ordered, with costs to the appel-
lant to abide the event.　All concur.

---

In re McCARTY'S WILL.

(Supreme Court, Appellate Division, Second Department.　December 30, 1910.)

1. EVIDENCE (§ 67*)—PRESUMPTIONS—CONTINUANCE OF CONDITION.
　　Where it appears that a will was delivered to testatrix at the time of
　its execution, her possession thereof will be presumed to have continued
　until the contrary is made to appear.
　　[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 87; Dec. Dig.
　§ 67.*]

2. WILLS (§ 163*)—EXECUTION—FRAUD—PRESUMPTION.
　　While the facts that one executor named in a will had acted as private
　secretary for testatrix's brother and subsequently for her, and that the
　other executor was her attorney, and that both received bequests, would

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

warrant the court in closely scrutinizing the will and the surrounding circumstances, fraud in the execution of the will cannot be assumed, but must be proved if relied upon to defeat it.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 389–396; Dec. Dig. § 163.*]

3. WILLS (§ 166*)—EXECUTION—FRAUD OR UNDUE INFLUENCE—PRESUMPTION. If a presumption of fraud or undue influence could arise in view of the fiduciary relation between testatrix and her executors coupled with large bequests to each of them, taken in connection with the fact that a large number of the natural objects of her bounty were excluded, such presumption will not obtain where it appears that such natural objects of testatrix's bounty embraced over 30 cousins, most of them living in Europe, that testatrix had lived in America for many years, that the will gave a large sum to the widow of testatrix's deceased brother, a bequest of $5,000 each to three cousins, that the subscribing witnesses were personal friends of testatrix, selected by her, that she had had the will under advisement for a month or more in her possession, took it to her lawyer's office with her witnesses, where she executed it with all the formalities of law, after which she held it in her possession for three years until she died without making any effort to discredit it, and it did not appear that she had had any such relation with her cousins, excluded from her bounty, as would have prompted her under any circumstances to have given them a place in the will, and both of the witnesses testified that she was of sound mind and without restraint in the execution of the will so far as they could observe.

[Ed. Note.—For other cases, see Wills, Dec. Dig. § 166.*]

Appeal from Surrogate's Court, Kings County.

Proceedings for probate of the will of Sara A. McCarty. From a decree admitting the will to probate (68 Misc. Rep. 283, 125 N. Y. Supp. 160) contestants appeal. Affirmed.

Argued before HIRSCHBERG, P. J., and WOODWARD, BURR, THOMAS, and CARR, JJ.

Max D. Steuer, for appellants.
Charles H. Beckett, for respondent.

WOODWARD, J. Sara A. McCarty, a resident of the county of Kings, died at Goshen, Orange county, N. Y., on the 17th day of August, 1909, leaving a last will and testament relating to both real and personal property, in which she nominated and appointed Joseph F. McClean and Everett Greene, the latter an attorney at law, as executors. This will attempts to dispose of a large estate, and has been admitted to probate; the contestants appealing to this court from the decree of the Surrogate's Court admitting the same to probate, and it being the contention of the contestants, certain heirs at law and next of kin, that the paper propounded as such last will is void, being tainted with undue influence amounting to fraud.

The will in question bears date of March 5, 1906, and the testatrix lived until the 17th day of August, 1909, or more than three years after making the will, during which time, so far as the evidence discloses, she retained possession of the instrument. At least the evidence in relation to the possession of the will goes no farther than to show that at the time of the execution of the same it was delivered to the testatrix, and, possession having been shown in her, it must be presumed to have continued until the contrary is made to appear.

The grounds of objection asserted originally on behalf of the contestants were: (1) That the propounded instrument is not the will of the testatrix; (2) that the propounded instrument is not properly executed according to law; (3) that the testatrix was not of sound mind, memory, and understanding, and capable of making a will; (4) that the propounded instrument was not freely executed by the testatrix; (5) that the execution, if any, of the propounded instrument, was procured by fraud and undue influence upon the testatrix by the executors and residuary legatees, or their privies; and (6) that the propounded instrument is illegal and void in respect to the residuum. Upon the hearing before the surrogate, after some evidence had been introduced tending to show that the testatrix was of sound mind, counsel for the contestants suddenly abandoned this phase of the case and asked to amend the petition, so that it should be conceded that the testatrix was of sound and disposing mind, which was done, and all of the other objections, with the exception of the one relating to undue influence, were practically abandoned, and are not urged here. The real question presented is the effect upon the will of the gifts of the testatrix to the executors, one of whom appears to have acted originally as the private secretary of decedent's brother, who died in 1905, and upon the latter's death to have occupied a like relation to the testatrix, and the other was her attorney in the drafting and execution of the will, and probably acted generally in that capacity, though this does not clearly appear. The contestants offered no evidence, but relied upon the fact of the fiduciary relations existing between the executors and the testatrix to raise a presumption of fraud or undue influence, because of the fact that the will carries a large bequest to each one of them, to the exclusion of a large number of the next of kin of the testatrix. The learned surrogate, after listening to the testimony of the subscribing witnesses, and to that of Joseph F. McClean, who was called as a surrogate's witness, decided that there was no ground for holding that the testatrix had been imposed upon in the disposition of her estate, and admitted the will to probate.

We are of the opinion that the relations of the executors were such as to warrant the court in closely scrutinizing the will and the surrounding circumstances, but that there were no facts disclosed by the will itself, or by any of the conditions surrounding its execution, which gives rise to the presumption of fraud; that is an issue which must always be proved, and cannot be assumed.

"A person of sound mind, acting with full knowledge of her affairs, competent to understand her relations to those whom she wished to benefit, may bestow her bounty as she likes, and no presumption of unfair dealing can arise, although one of the beneficiaries happens to be her attorney. Undue influence, when relied upon to defeat a testamentary disposition, must be proved, and not merely assumed to exist. In re Smith, 95 N. Y. 516. It was the duty of the contestants to prove, if they could, that the will was other than the free act of the testatrix, and, until some impediment was shown, there was no need of any further testimony from the proponent upon the point. * * * The evidence discloses a complete knowledge on the part of the testatrix of the contents of the will, a full legal capacity, and the absence of restraint." Loder v. Whelpley, 111 N. Y. 239, 250, 18 N. E. 874, 878.

The contestants rather reluctantly admit this general rule; but it is urged that the fiduciary relation, coupled with a large bequest to each of them, taken in connection with the fact that a large number of the natural objects of her bounty—her heirs at law and next of kin—were excluded from a participation in her bounty, is sufficient to give rise to the presumption which is urged, and there are some expressions in judicial discussions of great character and respectability, which give some color to this contention, but we think the cases will be examined in vain for an adjudication which holds that under circumstances which exist in this case the contestants have been permitted to prevail without offering some affirmative evidence.

It sounds well to declaim about the exclusion of those who are the natural objects of one's bounty; but, before we assume fraud as against reputable citizens, we should inquire who these "natural objects" are, and what claims they had upon the testatrix's bounty. The contestants who appear here are Mary Butler, a first cousin of decedent; Rose F. Kane, a second cousin of decedent; and Mary Kane, who occupied the same relationship as the latter. There were 28 other cousins and one second cousin of the decedent, and perhaps others, who have not sought to interfere with the probate of the will, and these cousins and second cousins of the decedent are the only ones embraced within the group of "natural objects" of the testatrix's bounty, and who are relied upon to afford the evidence of fraud to overthrow this will. Fifteen of these cousins, so far as known, live in Ireland, the most of them in County Down; one of them was last heard of in Australia and another in Alaska; one of them resides in the Isle of Man; four of them in Glasgow, Scotland; three of them, legatees under the will, live in Brooklyn, Rosendale, Ulster county, and Brooklyn, respectively; one in San Francisco and another in Liverpool, England; and the contestants, Mary Butler, Mary Kane, and Rose Kane, as well as Arthur Kane, a second cousin, live either in Greater New York or Mt. Vernon. The decedent was at least 60 years of age, and had resided in this country for many years, and it is easy to see how she could have been oblivious to the claims upon her of these cousins in Ireland, Australia, Alaska, Glasgow, and Liverpool, whom she had probably never seen or heard of except as a matter of family record; and it might even be guessed that she was not recklessly unmindful of the duties of kinship in not keeping track of and remembering in her will those second cousins, and even a first one, who now seeks to overthrow the will. When we remember that under the general rule of descent the real estate passes first to the lineal descendants, then to the father, then to the mother, and lastly to the collateral relatives, and that under the law of distributions the interests of cousins are still more remote (Decedent Estate Law [Consol. Laws, c. 13] §§ 81–98), the "natural objects of the testatrix's bounty" have something of the character of a dissolving view; at least they are not as formidable in fact as they appear in rhetoric, and we are of the opinion that a person of sound disposing mind might absolutely close his eyes and his mind to the existence of his cousins, and grant his entire estate to intimate business and

social associates, without giving rise to the presumption of having been defrauded by undue influence in the disposition of his property.

Having placed these "natural objects of the testatrix's bounty" in their proper light, as they appear in the law, let us examine briefly the will, that we may discover whether it does, in fact, disregard the claims of those who had a right to expect from her. First she gives to each of two priests the sum of $5,000, with a request for masses for the repose of her soul. Then she gives to her executors $50,000 for a memorial for her deceased brother, John McCarty, "according to my wishes expressed to them." Next she gives $1,000 each to a day nursery and to a hospital, each of them identified with the Roman Catholic Church, in which it appears from the testimony she was much interested. This is followed by a bequest of $1,000 to a certain bishop and his successors for the purpose of caring for her family lot in the cemetery. Following this is a bequest of $15,000 to the widow of her deceased brother; and likewise the life use of the family home—for it appears from the testimony that the decedent and her brother and his wife had all lived together at 267 Berkeley Place, Brooklyn, and that the widow still resided there at the time of the making of the will—to the widow. Added to this is a trust fund of $50,000, the income of which is to be paid to the widow of her deceased brother. Clearly there is nothing unnatural or inhuman in these provisions. John McCarty was her only brother; it is intimated, rather than proven, that some part of her estate came from this brother, and in making these provisions for her brother's widow, who had made her home with the decedent during and after the death of her husband, it would seem that the "natural object of her bounty" was being looked after with a fair degree of assiduity. In the next paragraph of the will the testatrix gives $5,000 each to her cousins, Thomas Graig, Margaret Allen, and Patrick McAvoy. This she follows with a gift of $5,000 to "my friend and godson, Joseph F. McClean," together with "all my stock and interest in the two corporations," naming them. This Joseph F. McClean is one of her executors, and who is alleged to have abused his fiduciary relations, and the next bequest is of $1,250 each to "my friends Catherine McClean, Charles Lyons, William Lyons and Anna Lyons." Another gift of $1,000 is made to William McClean, and still another gift of $1,000 each is made to Mary Connolly and Anna Connolly of Cold Spring, N. Y., and then in the fourteenth clause of the will the testatrix makes the bequest which has stirred up the contestants to activity. She gives all the "rest, residue and remainder" of her estate "to the persons hereinafter named as executors of this my will; in the use of the same I am satisfied they will follow my wishes. But this gift, devise and bequest to them is personal and absolute, without condition, limitation or restriction."

What is there about this will which justifies a presumption that it was fraudulently procured? No fact is shown which casts suspicion upon it. The subscribing witnesses were persons personally selected by the decedent. Mrs. McCosker was asked by the decedent to become a witness to her will more than a month before its final execution,

and on the day of its execution Mrs. McCosker was at the home of the decedent, and the two of them went to the office of the decedent's attorney, one of her executors, for the purpose of executing the will, and when they arrived there decedent took the will from a bag which she carried and declared the same to be her will and asked Mrs. McCosker and William J. Buttling (former sheriff of Kings county), whom she had sent for, to sign the same as witnesses. Mr. Buttling testified that he had known the testatrix from the time that he was a boy, that he knew her well enough so that he addressed her as "Mary Ann"; and Mrs. McCosker testified that she had known her intimately for many years, that they visited at each other's houses, and that at the time of the original request to act as a witness decedent had told her of her desire to make a will, but that she desired to read it over a few times to see that it was just what she wanted before it was executed. Both of these witnesses testify that the decedent was in sound mind, and that she was without restraint in the execution of the will so far as they could observe. As was said by the court in Loder v. Whelpley, supra:

"The proof of the execution of the will was complete and perfect. It was followed by cross-examination, at great length, * * * serving only to confirm and strengthen, by a variety of repetitions, the facts related by the subscribing witnesses. The testatrix was shown to be of perfect mind and memory, to have executed the instrument in the presence of her friends and neighbors, they signing, as witnesses, at her request, she at the same time declaring the paper to be her last will and testament."

This was exactly the case here. The testatrix had the matter under advisement for a month or more; she mentioned it to her friend and asked her to be a witness when she had satisfied herself of the contents of the will; that it was what she wanted; and then she called on this same friend to go with her to the lawyer's office and to sign the will as a witness. She had the will in her possession when she entered the lawyer's office. She executed the same with all the formalities of the law in the presence of witnesses whom she had selected from among her intimate friends, and then she took the completed will away with her and kept it for three years before she passed on, and no one appears to suggest that she ever made any effort to discredit the will, or that she had any such relations with her cousins as would have prompted her, under any circumstances, to have given them a place in her will, and this court is asked to presume that this will was fraudulently executed, because two of the beneficiaries happened to occupy confidential relations with her.

We think the disposition made of the matter by the learned surrogate was in harmony with the law, and that the decree should be affirmed, with costs. All concur.